## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KEVIN CONNOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-1877 (TSC) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION SETTING FORTH
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Kevin Connor sued the United States, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.* (the "FTCA"), for damages that he allegedly sustained when a United States Postal Service ("USPS") truck hit the ambulance in which he was travelling during an emergency run on December 7, 2012.

The court conducted a four-day bench trial from June 29, 2015 through July 2, 2015, the parties filed post-trial briefs ("PTBs") on August 25, 2015, and the court heard closing arguments on September 9, 2015.

Based upon the evidence presented at trial, and having reviewed the parties' submissions, the court makes the findings of fact and conclusions of law set forth below. Based on these findings of fact and conclusions of law, the court concludes that Plaintiff has not sustained his burden of proof on his negligence claim, and that judgment must therefore be entered in favor of the United States.

Specifically, while the court has determined that Plaintiff has carried his burden of establishing by a preponderance of the evidence that the driver of the USPS truck acted

negligently in causing the collision between his truck and the ambulance, the court finds that

Plaintiff has failed to carry his burden of establishing by a preponderance of the evidence that the

accident was the proximate cause of his alleged injuries.  Given this finding, the court will not

address the evidence presented to it on mitigation and calculation of damages.

## I.     FINDINGS OF FACT

### a.   Whether Defendant's Negligence Caused The Accident

Four witnesses testified about the facts and circumstances surrounding the accident:

(i) Plaintiff Kevin Connor; (ii) ambulance driver Scott Leone; (iii) USPS truck driver John Scott;

and (iv) Tammie Creamer, Supervisor of Emergency Dispatchers for the District of Columbia's

Office of Unified Communications.  The court finds that all four witnesses testified credibly

about the accident.

The court makes the following findings of fact regarding the December 7, 2012 accident:

1. Plaintiff, D.C. Fire Department paramedic Kevin Connor, was a passenger in
   the ambulance (Medic 5), which was being driven by D.C. Fire Department
   firefighter/EMT Scott Leone.  (Pl. Ex. 21; T-47:5-11, 533:23-24).

2. At around 2:30 P.M., the D.C. Fire Department received an emergency call
   reporting a person in medical distress inside a D.C. Metro station.
   (Def. Ex. 9B; T-37:14-22, 48:5-12).

3. At around 2:30 P.M., Medic 5 was dispatched to respond to the emergency.
   (Def. Ex. 9B; T-37:23-39:1).

4. Between 2:37 P.M. and 2:40 P.M., Connor radioed D.C. Fire Department
   dispatch from Medic 5, which was en route to the emergency, to state that he
   would bring a backboard down to the Metro station.  An emergency siren is
   clearly audible on the dispatch recording.  This siren was emanating from
   Medic 5.  (Def. Ex. 9; T-33:9-34:10, 45:20-46:24).

   a. The court bases its finding that the siren that is audible during the radio
      transmission was emanating from Medic 5 on Creamer's testimony that
      the siren was "definitely a background noise [from] where the transmitting
      unit was."  (T-34:5-10).  Though she could not testify with certainty
      whether it was Medic 5's siren or the siren of another emergency vehicle,
      there was no testimony or other evidence indicating that there was another

emergency vehicle in the vicinity of Medic 5 at the time of the
transmission.  (T-34:5-10, 35:11-18).  Connor also testified that the siren
that can be heard during the transmission was emanating from Medic 5.
(T-45:20-46:24).

5.  Medic 5 and the USPS truck collided at the intersection of 11th and P Streets
in Northwest Washington, D.C. at around 2:45 P.M., while Medic 5 was
en route to the emergency inside the Metro station.  (Def. Ex. 9A; T-29:8-20,
46:25-47:4).

6.  At the time of the accident, the USPS truck, driven by USPS employee
John Scott, was travelling eastbound on P Street through a green light.
(T-523:8-16).

7.  At the time of the accident, Medic 5 was travelling southbound on 11th Street
through a red light.  (Pl. Ex. 21; T-523:17-22, 546:6-19).

8.  At the time of the accident, Medic 5's emergency audible and visual signals
were both activated.  This finding is based on the following:

a.  The fact that, as noted above, Medic 5's emergency siren was on during a
radio transmission shortly before the accident, and there was no testimony
or other evidence indicating that it had been turned off between the time of
that transmission and the moment of impact.  (Def. Ex. 9; T-33:9-34:10,
45:20-46:24).[1]

---

[1] The court recognizes that Connor acknowledged at trial that there have been times when he has
turned off a siren to respond to dispatch, and that he would "probably" turn off a siren if he was
"going to have a long conversation" with dispatch because "[i]t's just hard to hear for a long
conversation."  (T-372:1-10; *see also* T-46:14-24).  The court also recognizes that, at one point
during Defendant's cross-examination of Connor, the court asked Connor if he "cut the siren off"
on the day of the accident, and he responded "I don't remember."  (T-372:13-17).  This evidence
and testimony, however, must be read against Connor's repeated testimony that Medic 5's siren
was on at the time of the accident, which this court deems credible and sufficiently corroborated.

The court also notes Defendant's argument that "the evidence indicates that the ambulance [was]
responding to the unit check or preparing to respond to the unit check" at the time of the
accident.  (Def. PTB at 40).  This argument is based on the fact that the event chronology for the
emergency to which Medic 5 was responding contains a 2:45 P.M. "check unit" entry for the
ambulance.  (Def. Ex. 9B; T-41:17-19).  The court will not draw the inference that Connor
turned off Medic 5's siren prior to the accident to respond to a "check unit" call, however,
because it does not appear that a "check unit" call was actually made, given that no such call was
captured on the dispatch recording.  (*Compare* Def. Ex. 9B *with* Def. Ex. 9).  As Creamer
testified about another earlier "check unit" entry for Medic 5 on the same event chronology, such
entries indicate a dispatcher's ***intent*** to check on a unit, but do not indicate ***whether a dispatcher***

b. Connor's testimony that, at the time of the accident, Medic 5's emergency audible and visual signals were operating.  (T-48:13-19, 377:20-378:8).

c. Leone's December 11, 2012 accident report, which states that, at the time of the accident, Medic 5's "visual and audible warning devices [were] active as per department order book."  (Pl. Ex. 21).

9. USPS truck driver John Scott "did not see the ambulance until impact," nor did he see its emergency audible or visual signals.  Scott also "didn't see any cars in front" of him on P Street or "any cars stopped on 11th Street."  He therefore "did not pull over [to yield right-of-way to Medic 5] because [he] wasn't aware that the ambulance was there," and he did not swerve or apply the USPS truck's brakes prior to impact.  (T-512:9-21, 513:9-17, 522:8-12, 523:25-524:7, 525:13-16).

10. Travelling eastbound on P Street towards 11th Street (as the USPS truck was just prior to the accident), the view of southbound 11th Street traffic is obstructed to some extent by buildings on the northwest side of 11th Street.  These buildings are set far enough back from the street that a vehicle driving eastbound on P Street should be able to see southbound 11th Street traffic prior to reaching the intersection, however.  (Pl. Ex. 19; T-524:10-525:12).

11. Scott had travelled eastbound on P Street several times prior to the day of the accident, and he knew that the "building on the corner would limit [his] view of the traffic moving south on 11th Street."  Despite this fact, Scott did not turn his head to look up 11th Street before entering the intersection because he was "relying on the green light" and because, when he drives, his "vision is to the point where [he] can incorporate what's around [him]."  (T-524:19-24, 526:13-527:20 ("If a bike or a car is coming and they're going to run a light, I can usually perceive that.")).

**b. Whether The Accident Caused Plaintiff's Alleged Injuries**

Four witnesses testified about Connor's injuries: (i) Plaintiff's medical expert,

Dr. Michael Batipps, a neurologist; (ii) Defendant's medical expert, Dr. Richard Conant,

an orthopedic surgeon; (iii) Connor; and (iv) Connor's wife Ekaterini Kapiotis.

The court finds that Connor and his wife testified credibly about Connor's pre-accident

back injuries, but that their testimony regarding his alleged post-accident injuries did not align

---

*actually radioed to check on a unit*.  (T-41:8-16 ("It's an indicator for [checking on a unit]. I can't say whether she checked on them or not, but that's an indicator.")).

with Connor's medical records in certain important respects.  As to the parties' medical experts,

the court finds that they each evinced a bias towards their respective side.  The court also finds

that significant portions of the testimony of Plaintiff's expert, Dr. Batipps, were not supported by

other evidence, and that his testimony as a whole was insufficient to establish that Connor's

alleged injuries were caused by the accident.  Most notably, Dr. Batipps (i) did not give

sufficient weight to Connor's medical records; (ii) gave too much credence to Connor's

subjective complaints about his alleged injuries during his January 2015 examination of him,

given that those complaints meaningfully diverged from the earlier complaints detailed in his

medical records; and (iii) was unpersuasive in trying to reconcile the inconsistencies between

Connor's present claims regarding his alleged injuries and the earlier claims detailed in his

medical records.  While the court considered the findings expressed in each medical experts'

report, as well as the testimony of each expert, the court also reviewed Connor's medical records

closely, and its findings are based on those records, as well as the expert testimony and reports.

The court makes the following findings of fact regarding Connor's injuries:

1. Prior to the accident, Connor had "been suffering with lower back strains for
   over 20 years."  Connor had injured his back while working approximately
   six times, though the pain "always went away in . . . seven to 10 days" and,
   after each injury, he was able to return to normal duties without going onto
   worker's compensation (meaning that none of his injuries kept him from
   working for upwards of 21 days).  With some of these prior injuries, Connor
   "really had trouble standing up."  On one occasion in the late 1980s, he was
   "coming down a stairwell . . . with a heavy gentleman unconscious, and the
   person at the other end dropped him, and [Connor] fell on top of him and
   [they] went down a flight of stairs."  Additionally, "every now and
   then," Connor would come back from work after having had to lift and carry
   "a really heavy patient" and "he'd be sore and tired," would "take aspirin or
   Advil" and "might take a day or two off," but "then he would go back to
   work."  (T-61:10-63:1, 368:8-18, 392:16-19, 489:7-18).

2. Prior to the accident, Connor's medical records from 2002, 2006, 2008 and
   2010 reference lower back injuries under the heading "Occupational Injuries,"
   including one notation on the 2002 medical record, which the court takes to be
   quoting Plaintiff directly, of "LB strains 'over 20+ years.'"  This medical

record also references, under the heading "PMHx" (which the court takes to mean "Patient's Medical History"), "lower back pain – only after heavy lifting."  (Def. Ex. 12 at 305, 314, 321, 334).

3.  Post-accident medical imaging procedures (including X-Rays, an MRI and a CAT scan) revealed pre-existing degenerative arthritic changes to Connor's spine which are of longstanding duration, representative of the aging process and typical for a man of his age.  (Def. Ex. 1; Pl. Ex. 14; Pl. Ex. 24 at 108-112; T-107:10-108:19, 112:15-121:8, 152:4-153:4, 156:7-159:16, 222:10-223:2).

4.  At the time of the accident, the USPS vehicle struck Medic 5 on its passenger side, where Connor was seated.  (T-47:5-48:4, 512:24-513:1, 535:8-12).

5.  Connor was not injured immediately after the accident.  This finding is based on the following:

    a.  Connor's testimony regarding the fact that he only realized that he was injured when he woke up the day after the accident.  (T-58:20-59:18).

    b.  The fact that, at about 2:47 P.M. on December 7, 2012 (*i.e.*, about two minutes after the accident), Connor radioed D.C. Fire Department dispatch from Medic 5 in response to repeated questions asking if anyone had been hurt in the accident and stated: "Negative from Medic 5 at this time. Nobody's injured."  (Def. Ex. 9; T-58:20-59:1).

    c.  The fact that, on December 10, 2012, three days after the accident, Connor filed an accident report that did not mention that he was injured.  (Pl. Ex. 21).

    d.  The fact that, on December 11, 2012, four days after the accident, ambulance driver Scott Leone filed an accident report that specifically stated that both he and Connor were "uninjured at the time of the accident."  (Pl. Ex. 21).[2]

6.  While Connor has complained of varying levels of localized back and neck pain since the day after the accident, if he had suffered an injury in the accident that resulted in the compression or irritation of any of the nerves or other neurological structures in his spine, he would likely have had radicular symptoms such as radiating pain, numbness or tingling (paresthesias).  The kind of pain radiation that could be expected from injuries in the neck and lower back areas that Connor complained about would be neck pain radiating

---

[2] The court notes that Connor never told Leone that he was injured in the accident, and that Connor did not speak to Leone from the date of the accident until about a month before trial. (T-389:5-14).  The court therefore finds that the reference in Leone's accident report to Connor being uninjured in the accident was based on Connor's statements on the day of the accident.

into the shoulders and arms and lower back pain radiating into the buttocks, hips and legs.  Neurologically speaking, radiating pain is a key factor in determining neurological and nerve damage resulting from neck, back, lower back and/or spinal column injuries.  (Def. Ex. 1; T-99:24-100:8, 102:11-17, 111:14-112:8, 117:11-120:6, 128:21-129:15, 136:19-144:17, 182:18-184:25, 197:11-198:6, 247:14-19).

7. Connor was seen by doctors three times for his subjective complaints of back and neck pain in the two weeks after the December 7, 2012 accident: On December 8, 10 and 19.  None of the medical records from these doctor's visits indicate that Connor complained of any radiating pain.  (Def. Ex. 1; Pl. Ex. 24 at 59-71).  Indeed, the record of Connor's December 19 visit to the Police & Fire Clinic explicitly states that Connor "denie[d] pain radiation to the L or UE."  (Pl. Ex. 24 at 66).[3]

8. From December 19, 2012 (less than two weeks after the accident) through January 30, 2013, Connor did not receive any medical attention for his alleged injuries.  Connor's explanations for this approximately six-week gap in medical treatment are unpersuasive, and the court agrees with Defendant's medical expert Dr. Conant that this gap "is not consistent with any ongoing post-traumatic injuries of any real concern."  (Def. Ex. 1; T-77:1-18, 100:9-15, 244:20-245:1).

9. Connor was seen by a number of physicians for his subjective complaints of back and neck pain, as well as for other medical issues, in the months following January 2013, but none of the medical records from these visits indicate that Connor complained of any radiating pain.  (*See* Def. Ex. 1; Pl. Ex. 24).  Indeed, a number of medical records explicitly state that Connor did not have any radiating pain or other radicular symptoms such as numbness or tingling, or that he had explicitly denied the existence of such pain or symptoms:

   a. January 30, 2013 – "Denies numbness or tingling in UE."  (Pl. Ex. 24 at 78).

   b. January 31, 2013 – "There is no radiation."  (Pl. Ex. 27 at 432).

   c. March 15, 2015 – "Denies numbness, tingling, or weakness in the LE/UE."  (Pl. Ex. 24 at 98).

---

[3] Plaintiff's medical expert, neurologist Dr. Batipps, attempted in various ways to explain away the absence of references to radiating pain in Connor's medical records for these and other subsequent doctor's visits.  The court finds these explanations unconvincing, particularly when they are read against the many medical records that explicitly state that Connor was not suffering from any radiating pain.  (*See, e.g.*, T-223:5-226:12).

    d.  March 28, 2013 – "PT deneis *[sic]* any radicular sx's."  (*Id.* at 105).

    e.  April 12, 2013 – "No numbness/tingling reported."  (*Id.* at 122).

    f.  May 20, 2013 – "Patient reports on-going non-radiating neck (left side) and low back pain (across the lower back). . . . Of note, he does not have pain, numbness or paresthesias radiating to the upper or lower extremities."  (*Id.* at 144).

    g.  May 28, 2013 – "There is no radiation."  (Pl. Ex. 27 at 423).

    h.  May 29, 2013 – "He denies pain radiation."  (Pl. Ex. 24 at 152).

    i.  June 10, 2013 – "Denies radicular sx or paresthesias."  (*Id.* at 165).

    j.  July 11, 2013 – "There is no radiation."  (Pl. Ex. 27 at 419).[4]

10.  The court finds that Connor's subjective complaints of pain radiation during Dr. Batipps' January 2015 examination of him, which form much of the basis of Dr. Batipps' expert report, are contrary to the overwhelming weight of the other evidence listed above.  (*See* Pl. Ex. 14 at 1 (basing conclusions in part on Connor's complaints of neck pain "with radiation to the left greater than right shoulder" and "lower back pain" that radiated "into the buttocks bilaterally")).  In doing so, the court relies on Dr. Batipps' testimony that (i) disc protrusions that impinge on nerve roots cause radiating pain (T-180:7-182:17); (ii) "pain radiation [is] a key factor in determining neurological and nerve damage" (T-247:14-19); and (iii) he "wouldn't buy" claims that an accident had caused a disc protrusion when the symptoms of such an injury – *i.e.*, radiating pain – did not show up until years after the accident (T-238:4-239:1).  The court simply cannot align Dr. Batipps' conclusion that the accident caused Connor's alleged injuries with this testimony, given that Dr. Batipps' conclusion is based in large part on complaints of radiating pain that appeared for the first time over two years after the date of the accident.

---

[4] The court notes that the record of Connor's February 14, 2013 visit to Nova Medical Group states that his neck pain "radiates to the left neck and right neck."  (Pl. Ex. 27 at 428).  As noted above, however, the kind of pain radiation that would be expected if the accident had resulted in an injury that compressed or irritated any of the nerves or other neurological structures in Connor's spine is neck pain radiating into the shoulders and arms and lower back pain radiating into the buttocks, hips and legs.  The notation in this medical record discusses neck pain "radiating" into both sides of the neck, which strikes the court as a fundamentally different, much more localized, kind of pain radiation.  Moreover, even if this notation of pain radiating to the left and right sides of Connor's neck constituted the type of pain radiation that evidences Connor having suffered neurological and/or nerve damage as a result of the accident, the court finds that its evidentiary value is far outweighed by the multiple other references in Connor's medical records to the absence of any pain radiation.

## II.   CONCLUSIONS OF LAW

1. Under the FTCA, negligence cases such as this one are governed by the law of the state in which the claim arose.  *See* 28 U.S.C. § 1346(b); *Richards v. United States*, 369 U.S. 1, 5 (1962).  Because the accident occurred in the District of Columbia, the District's law governs here, as both parties agree. (Pl. PTB at 18; Def. PTB at 38).

2. "In order to show negligence, a plaintiff must establish, by a preponderance of the evidence, the applicable standard of care, a breach of that standard by the defendant, and a causal relationship between the breach and the plaintiff's injury." *District of Columbia v. Price*, 759 A.2d 181, 183 (D.C. 2000) (citing *District of Columbia v. Wilson*, 721 A.2d 591, 597 (D.C. 1998)).

### a.   Whether Defendant's Negligence Caused The Accident

1. The District of Columbia's Municipal Regulations provide as follows:

   > Upon the immediate approach of an authorized emergency vehicle making use of audible and visual signals . . . the driver of every other vehicle shall yield the right-of-way and shall immediately drive to a position parallel to, and as close as possible to, the right-hand edge or curb of the roadway, clear of any intersection, and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.

   18 DCMR § 2210.1.

2. Having determined that Medic 5's emergency audible and visual signals were both activated at the time of the accident, the court finds that section 2210.1 supplies the applicable standard of care for this case – *i.e.*, that USPS truck driver John Scott was required to yield the right-of-way to the ambulance at the intersection of 11th and P Streets.

3. The court agrees with Defendant, however, that Plaintiff must also establish that Scott should have heard Medic 5's emergency siren and/or seen its emergency lights, and thus should have known that the ambulance was approaching.  *See Jackson v. Schenick*, 174 A.2d 353, 355-56 & n.3 (D.C. 1961) (unless motorist conforms to standard of care requiring him to see what reasonably there is to be seen and to hear what reasonably there is to be heard, he assumes consequences for negligent operation of his vehicle); *District of Columbia v. Lapiana*, 194 A.2d 303, 303-04 (D.C. 1963) (finding that ambulance's siren was "operating and [its] red light [was] flashing," but taking into account obstructions to civilian driver's view and hearing, as well as the absence of any indication that anyone else on the road heard ambulance approaching, in determining that civilian driver was reasonably unaware of approaching ambulance).

4. Despite Scott's testimony that he was unaware of Medic 5's presence, the court nevertheless concludes that Plaintiff has established by a preponderance of the evidence that Scott should have seen and/or heard the ambulance prior to the accident, and yielded the right-of-way to it.  The court's conclusion is based on the following:

   a. The court's finding that, at the time of the accident, Medic 5's emergency audible and visual signals were operating;

   b. The common sense inference regarding the visibility and volume of D.C. Fire Department ambulance lights and sirens when they are activated, which is corroborated in part by the sound of the siren on the dispatch recording;

   c. The photograph of the intersection at 11th and P Streets and Scott's testimony about that intersection, which reveal that the buildings on the northwest side of 11th Street are set far enough back from the street that a vehicle driving eastbound on P Street could see southbound 11th Street traffic prior to reaching the intersection; and

   d. Scott's own testimony regarding:

      i. His familiarity, prior to the accident, with the intersection at 11th and P Streets and the buildings obstructing the view of southbound traffic on 11th Street;

      ii. His failure to look north up 11th Street as he approached the intersection going eastbound on P Street despite his aforementioned familiarity with the intersection and its obstructions;

      iii. His self-professed ability to perceive vehicles that are going to run a red light; and

      iv. The fact that he did not see the ambulance until the moment of impact despite the fact that the buildings in question – which are set back significantly from the street – would not have obstructed his view all the way up until the moment of impact.

5. Because the court has concluded that Scott should have seen and/or heard the ambulance prior to the accident, and yielded the right-of-way to it, the court therefore concludes that Connor has established by a preponderance of the evidence that Defendant breached the applicable standard of care.[5]

---

[5] Defendant argues that "Plaintiff must proffer expert testimony regarding the applicable standard of care based upon Mr. Scott's sightline and the decibels of the alleged siren to establish that [he] . . . acted negligently in proceeding through a green light at a low rate of speed."  (Def. PTB at 42).  While Defendant correctly notes that expert testimony is required "if the subject in

**b.  Whether The Accident Caused Plaintiff's Alleged Injuries**

1. Based on the findings of fact detailed above regarding Connor's alleged injuries, the Court concludes that Connor has failed to establish by a preponderance of the evidence that the accident was the proximate cause of those alleged injuries.  The court's conclusion is based on the following:

   a. Connor's extensive, decades-long history of work-related back injuries pre-dating the accident;

   b. The medical evidence revealing pre-existing degenerative arthritic changes to Connor's spine which are of longstanding duration, representative of the aging process and typical for a man of his age;

   c. The fact that Connor was not injured immediately after the accident;

   d. The approximately six-week period – from December 19, 2012 (less than two weeks after the accident) through January 30, 2013 – during which Connor did not receive any medical attention for his alleged injuries, which is not consistent with Connor having suffered a serious back and/or neck injury in the accident, and for which Connor has offered an unpersuasive explanation; and

   e. The fact that Connor's post-accident medical records do not reveal any evidence of the kind of radiating pain that would be expected if he suffered neurological and/or nerve damage as a result of the accident, with complaints of radiating pain first arising when Connor was examined by his medical expert in January 2015, after this lawsuit had been filed.

2. Because the court concludes that Connor has failed to establish by a preponderance of the evidence that the accident was the proximate cause of his alleged injuries, the court finds that Connor has not sustained his burden of proof on his negligence claim.

3. Because the court finds that Connor has not sustained his burden of proof on his negligence claim, judgment must therefore be entered in favor of the United States.

---

question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson" (Def. PTB at 42-43) (quotation omitted), for the reasons set forth above, this court finds that determining whether Scott should have seen and/or heard Medic 5 is not "beyond the ken of the average layperson" given the record evidence in this case.  (*Id.*).

**III.     CONCLUSION**

For the reasons set forth above, and based upon the evidence presented at trial, the court concludes that Plaintiff Kevin Connor has not sustained his burden of proof on his negligence claim, and that judgment must therefore be entered in favor of Defendant the United States.

Date:  November 6, 2015

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge